[Civ. No. 21524. Third Dist. Dec. 1, 1982.]

JAMES KING, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
Defendant and Respondent.

COUNSEL

Joan G. Poulos for Plaintiff and Appellant.

Donald L. Reidhaar, Christine Helwick and Melvin W. Beal for Defendant and Respondent.

OPINION

CARR, J.—Appellant James King sought mandate in Yolo County Superior Court to compel the Regents of the University of California to conduct a full adversary hearing on the decision to deny him tenure and to disclose the entire contents of his tenure file. Following denial of the requested relief, appellant appeals to this court.

*The Facts*

The University of California has established a procedural mechanism for admission to its professorial ranks. There are four titles or ranks in the professor series: (1) instructor; (2) assistant professor; (3) associate professor; and (4) professor. The positions of associate professor and professor are subject to tenure; assistant professor and instructor are not. Each appointment as an assistant professor is for a maximum of two years, and total university service at this academic level is limited to eight years. The university regulations contemplate that at some point during the appointment as an assistant professor, the person will undergo a formal appraisal as a candidate for a tenured position.

The tenure review process involves extensive evaluation of the candidate on several levels. Tenure appraisal is made by other faculty members of the department involved, outside experts in the candidate's field, the departmental chair, the appropriate dean, an ad hoc review committee, a standing personnel committee of the academic senate, and the chancellor's office. The candidate participates in the various steps of this review process by: (1) responding in writing to the departmental evaluation and recommendation, and (2) requesting that particular persons be asked for evaluations. If the decision is made not to reappoint an assistant professor, the candidate may request a summary of his

review file and the reasons for the decision. The candidate may respond in writing to the decision and appeal to the standing committee on privilege and tenure. The committee holds a preliminary review to determine whether a prima facie case of procedural error has been made, in which case hearings may be held. The committee makes a recommendation to the chancellor, with a copy to the candidate, and the chancellor makes and informs the candidate of the final decision.

Appellant King was initially hired as a lecturer in Afro-American studies in 1973. He was elevated to assistant professor in 1976. During the 1979-1980 academic year, appellant underwent the tenure review process but tenure was not recommended. He was given one year's notice that his contract would not be renewed, and was provided with a terminal year of appointment for the 1980-1981 academic year. Appellant requested a copy of his personnel file and was given the summary provided for by university regulations. He appealed to the standing committee on privilege and tenure which conducted an investigation and concluded no prima facie case of violations of university policy had been established. On this basis his request for a hearing was denied.

DISCUSSION

I

■ Appellant initially contends due process of law entitled him to a full adversary hearing upon his removal from the tenure track. We disagree. Appellant has not been deprived of any liberty or property interest sufficient to require a formal hearing under the due process clause. (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, § 7.)

This issue has been extensively litigated. The unanimous conclusion is that a nontenured professor has no cognizable property interest in the renewal of his employment.[1] In very similar circumstances the United States Supreme Court held the appellant "surely had an abstract concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 578 [33 L.Ed.2d 548, 561, 92 S.Ct. 2701].)

Appellant attempts to distinguish *Roth,* on the basis that *Roth* had been hired for only a single year whereas appellant had previously been reappointed to the status of assistant professor, and had been employed for a total of eight years, which gave him a more reasonable expectation of continued employment. It is a

[1]We are not faced with the question of "de facto" tenure presented in *Perry* v. *Sinderman* (1972) 408 U.S. 593, 600 [33 L.Ed.2d 570, 579, 92 S.Ct. 2694].

distinction without a difference. In both cases the complaining party was a nontenured faculty member who was simply not rehired after his contract of employment had expired. In neither case did the professor have a "legitimate claim of entitlement" to continued employment. (*Board of Regents* v. *Roth, supra,* 408 U.S. at p. 577 [33 L.Ed.2d at p. 561].) The same conclusion was reached in the recent case of *Chang* v. *Regents of University of California* (1982) 135 Cal.App.3d 88 [185 Cal.Rptr. 167]. In *Chang,* the court resolved the due process issue adversely to a candidate for tenure under circumstances almost identical to those in the present case. The court stated "[h]ere, appellant undoubtedly hoped to receive tenure; but the regents have adopted a formal system of academic tenure. Those procedures were faithfully complied with in all the steps which led up to the decision of the chancellor to deny tenure. There was no due process right to a hearing." (*Id.,* at p. 91.) We concur in this reasoning.[2]

■ Appellant further contends he was deprived of a "liberty" interest without due process in that his "good name has been besmirched" by the decision not to award him tenure. While the court in *Roth* opined that if the university had "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities . . . or invoked any regulation to bar the [appellant] from all other public employment in state universities" the result might well have been different, it determined the record did not support any such conclusion. (*Board of Regents* v. *Roth, supra,* 408 U.S. at p. 573-574 [33 L.Ed.2d at p. 559].) The court stated "[m]ere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" (*Id.,* at p. 574, fn. 13 [33 L.Ed.2d at p. 559].)

Defendant's claim that he has been stigmatized by "having been adjudged incompetent to be a tenured professor at the University of California" . . . is without merit. Appellant was not adjudged incompetent in any respect. The decision in question was based on the "considered opinion of scholars in each of the various areas of review that his research work did not meet the stringent standard of excellence required to achieve tenure." Failure to achieve unanimous praise as "excellent" does not equate with being adjudged incompetent. There was no evidence of a conscious effort by the university to stigmatize

---

[2]Appellant urges there must be a balancing of the competing interests of the individual and the government to determine whether procedural safeguards should be applied in this case. We note this "weighing process has long been a part of any determination of the *form* of hearing required in particular situations by procedural due process. But, to determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." (*Board of Regents* v. *Roth, supra,* 408 U.S. at pp. 570-571 [33 L.Ed.2d at p. 557].) (Italics in original.) Having concluded appellant has due process right to a formal hearing the balancing of interests analysis is inapplicable.

him.[3] Just as in *Roth,* all that clearly appears from the record is that appellant's contract as an assistant professor expired and was not renewed. "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." (*Board of Regents* v. *Roth, supra,* 408 U.S. at p. 575 [33 L.Ed.2d at p. 560]; see also, *Grant* v. *Adams* (1977) 69 Cal.App.3d 127, 135 [137 Cal.Rptr. 834].)

## II

■ Appellant urges he is entitled to a hearing under his common law right to a fair proceeding. The cases upon which he relies, however, involve factual situations wherein the aggrieved party had been expelled or excluded from an organization which exerts a practical control over the person's right to pursue a particular profession or calling. (See, *Ezekial* v. *Winkley* (1977) 20 Cal.3d 267, 271 [142 Cal.Rptr. 418, 572 P.2d 32]; *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 [116 Cal.Rptr. 245, 526 P.2d 253]; *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 731 [155 P.2d 329, 160 A.L.R. 900].) The underlying rationale of these cases is that certain private organizations possess substantial power either to thwart an individual's pursuit of a lawful trade or to control the terms under which it is practiced and therefore there must be protection against arbitrary administrative interference. (*Ezekial* v. *Winkley, supra,* 20 Cal.3d at p. 272.) The courts have provided a right of "fair procedure" prior to expulsion or exclusion which includes adequate notice of any "charges" against a person and a reasonable opportunity to respond. (*Ibid.*)

The *Marinship-Pinsker* line of cases is distinguishable in that the University of California does not possess the degree of practical control over a teacher's career as did the professional society and labor union in those cases. (See, *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 [81 Cal.Rptr. 623, 460 P.2d 495]; *James* v. *Marinship, supra,* 25 Cal.2d at p. 731.) Appellant's right to practice his profession has not been foreclosed by the university. Moreover, "[t]he underlying theme of these decisions, variously stated, is that membership in an association, with its associated privileges, *once attained,* is a valuable interest which cannot be arbitrarily withdrawn. Thus, they comport with the broader principle that one *on whom an important benefit or privilege has already been conferred* may enjoy legal protections not available to an initial applicant for the same benefit." (*Ezekial* v. *Winkley, supra,* 20 Cal.3d at p. 273.) (Italics added.) The university has simply decided not to accord appellant the special privilege of life-time employment. His abili-

---

[3]Appellant advances hearsay allegations that certain members of the university faculty made "disparaging remarks" about him at faculty meetings and to one potential employer. These allegations were controverted by the named faculty members and no further proof on this issue was advanced.

ty to seek other employment in his profession has not been curtailed in any respect, nor has his professional status been removed or damaged. The cases establishing a common law right of fair procedure are not applicable to the instant situation.[4]

Even were we to find a right to a fair proceeding, we perceive no arbitrary, capricious or unjust procedure in the decision to deny appellant tenure. The university's system of evaluating a candidate for tenure involves a carefully balanced and extensive review of each case. It provides the candidate with more than adequate notice and opportunity to respond to any "charges" against him through written responses which are included in the file. Appellant requested and received a summary of his tenure file, and the regulations afforded him an opportunity to respond. Following the chancellor's decision, appellant appealed to the committee on privilege and tenure with whom he met personally. Upon finding appellant had not made out a prima facie case of irregularities in his tenure evaluation procedure, the committee concluded no hearings were required. The procedures established for tenure review were scrupulously followed in appellant's case. He was given adequate notice of the reasons for the decision to deny him tenure and a reasonable opportunity to respond. He was entitled to no more.

### III

Finally appellant contends it is unfair to deny him access to the contents of his personnel file and yet require him to make a prima facie showing of irregularities in the tenure evaluation as a prerequisite to a formal hearing. He relies on a series of federal appellate decisions in which complaining faculty members won disclosure of their personnel files in sex discrimination actions under title VII of the Civil Rights Act of 1964. (42 U.S.C. § 2000e et seq.) (*Lynn* v. *Regents of the University of California* (9th Cir. 1981) 656 F.2d 1337; *Jepsen* v. *Florida Bd. of Regents* (5th Cir. 1980) 610 F.2d 1379; *Keyes* v. *Lenoir Rhyne College* (4th Cir. 1977) 552 F.2d 579.) Disclosure of the files was ordered in two of these cases after the plaintiff made a prima facie showing of discrimination and the university relied on its tenure evaluations for a legitimate nondiscriminatory reason behind its actions. (*Jepsen* v. *Florida Bd. of Regents, supra,* 610 F.2d at p. 1382.) These cases are neither controlling nor persuasive. Each involved a strong national interest in preventing sex discrimination, not present in this case. (See, e.g., *Lynn* v. *Regents of the University of California, supra,* 656 F.2d at p. 1347.) In fact, appellant does

---

[4]Appellant argues he *was* deprived of a benefit already attained as his one-year terminal appointment was an interruption of his two-year appointment with a new terminal appointment of one year. He exalts form over substance. University regulations required appellant be given at least a 12-month notice of nonrenewal. Whether this be called a "terminal appointment" or "one year's notice" seems immaterial. The fact remains appellant simply was not rehired upon expiration of his contract.

not claim he was the victim of any form of discrimination. He simply urges the refusal to grant complete disclosure was unfair. We disagree.

In *McKillop* v. *Regents of University of California* (N.D.Cal. 1975) 386 F.Supp. 1270, the court refused to disclose the tenure file of one of appellant's colleagues at the University of California at Davis. The court determined disclosure of the entire file would be a substantial threat to a peer evaluation system which depends on confidentiality and has produced "one of the finest, if not the finest, institutions of higher education in the country." (*Id.*, at p. 1275.) The court concluded the university's need to preserve the confidentiality of the evaluations outweighed the plaintiff's need for their production, particularly as plaintiff was given an alternate method of discovery. (*Id.*, at p. 1277.)[5]

This reasoning was adopted in *Board of Trustees* v. *Superior Court (Dong)* (1981) 119 Cal.App.3d 516 [174 Cal.Rptr. 160], wherein the court considered a discovery request for tenure files in a defamation action. The court concluded the competing interests of the parties could be accommodated by deleting the identity of the sources of the confidential letters and allowing discovery of the substance of the material. (*Id.*, at pp. 532-533.) The court arrived at this compromise by examining California's Information Practices Act of 1977 which provides for disclosure of confidential information in public records to an affected individual " 'without identification of the source. This may be done by providing a copy of the text of such material with only such deletions as are necessary to protect the identity of the source or *by providing a comprehensive summary of the substance of the material.*' " (*Id.*, at p. 532; citing Civ. Code, § 1798.38.) (Italics added.)

This statutory procedure for disclosing confidential material mirrors the university's policy of allowing the candidate a comprehensive summary of his file. Just as in *McKillop,* this alternate method of discovery has reduced the weight of appellant's need to see the entire contents of his file. The only material remaining for appellant to discover is the identity of the sources of the evaluations. These names would appear to be of little value to him, as it is the substance of their comments with which he should be concerned. On the other hand, the names are the most important thing for the university to protect. The principle of confidentiality "is a prerequisite to the effectiveness of a peer evaluation system of faculty selection." (*McKillop* v. *Regents of University of California, supra,* 386 F.Supp. at p. 1276.)

We conclude the university's need to maintain confidentiality outweighs any marginal benefit to appellant from disclosure of the names of his evaluators.

---

[5]The court offered to have an impartial academician review the files to determine if there were any inferences of discrimination. The plaintiff declined the offer. (*McKillop, supra,* 386 F.Supp. at p. 1277.)

Appellant has not demonstrated a need for *total* disclosure which outweighs the university's interest in protecting its system of evaluation.

The judgment is affirmed.

Puglia, P. J., and Regan, J., concurred.

A petition for a rehearing was denied December 30, 1982, and appellant's petition for a hearing by the Supreme Court was denied January 26, 1983. Bird, C. J., was of the opinion that the petition should be granted.