[No. A044630. First Dist., Div. Two. Oct. 4, 1991.]

PETER SCHARF et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

**COUNSEL**

Robert J. Bezemek and Robert S. Gerstein for Plaintiffs and Appellants.

David E. Feller, James E. Holst, Gary Morrison, Philip E. Spiekerman, David M. Birnbaum and Melvin W. Beal for Defendants and Respondents.

## OPINION

KLINE, P. J.—This action, which presents both statutory and constitutional challenges to the process of academic peer review employed by the University of California, requires us to determine the extent of the autonomy granted the university under article IX, section 9 of the California Constitution.

### STATEMENT OF THE CASE

Appellants are the University Council, the American Federation of Teachers, and six present or former members of the university faculty denied tenure or promotion. Respondents are the Regents of the University and various senior administrative officials thereof (hereinafter collectively referred to as the University). Upon stipulation of the parties, the Council of University of California Faculty Associations was permitted by the superior court to formally intervene in the action and to unite with the University in resisting appellants' claims.

Appellants commenced the action by jointly filing a petition for writ of mandate and complaint. As amended, the petition alleged that by denying appellants complete access to information considered by the University in making tenure and other employment determinations the University deprived them of a meaningful opportunity to respond to criticism that resulted in adverse determinations, in violation of appellants' constitutional rights to privacy and due process of law and Education Code section 92612,[1] which requires the University to provide its employees nearly complete access to their personnel files. The complaint sought an order directing the University to provide the disclosure required by section 92612 as well as injunctive relief and damages.

On May 30, 1986 the University moved for judgment on the pleadings, contending, as here relevant, that section 92612 is unconstitutional and that appellants failed to state causes of action on the privacy and due process claims. On November 25, 1986, the Alameda County Superior Court found

---

[1]All statutory references are to the Education Code unless otherwise indicated.

the statute unconstitutional on its face and granted the motion as to that claim. The court denied relief as to the federal constitutional claims, finding that the University had failed to establish the absence of factual issues.

On June 13, 1987, the superior court granted the University's and intervener's motions for summary adjudication of issues, concluding that the University's procedures relating to the evaluation and promotion of faculty violate neither the due process clauses of the California and United States Constitutions nor the right of privacy conferred under article I, section 1, of the California Constitution.[2] Appellants thereupon dismissed those portions of the petition that had not been adjudicated by this order. After final judgment was entered, appellants filed timely notices of appeal.

### FACTS[3]

The process by which the University determines whether to grant tenure or promotion is initiated when the chairperson of the candidate's department notifies the candidate that a determination will be made and requests pertinent information. The candidate has the right to identify persons he or she believes might not objectively evaluate the candidate's qualifications or performance, and this information is preserved in the personnel review file. The chairperson solicits letters from persons deemed qualified, including a reasonable number nominated by the candidate. This solicitation must include not only opinions of the candidate's departmental colleagues but also the views of "distinguished extramural informants."

Before the department makes its decision, the chairperson must provide the candidate an opportunity to review his or her file, except that the candidate receives only an oral or written "comprehensive summary" of evaluations by persons who provided their views on the understanding they would be held in confidence.

After the department has made its recommendation, the chairperson forwards it and the candidate's file to the dean or provost of the appropriate

---

[2]The court also denied that portion of intervener's motion for summary adjudication, which claimed that the University's procedures are not subject to challenge under Code of Civil Procedure section 1085. The court deemed this contention to be in the nature of a demurrer "and for that reason not being a proper forum of motion for summary adjudication."

[3]The relevant facts are based largely on the University's academic personnel manual, of which we take judicial notice. (See Mendoza v. Regents of University of California (1978) 78 Cal.App.3d 168, 176, fn. 3 [144 Cal.Rptr. 117].) The University's process of academic personnel review is also set forth in an appendix to the opinion in Laborde v. Regents of University of California (C.D.Cal. 1980) 495 F.Supp. 1067, 1074.)

college, school or division. The chairperson reports any significant evidence and differences of opinion which would support a contrary recommendation and the results of the vote of the department. The chairperson may also make an independent evaluation and recommendation.

The candidate is informed orally or, upon request, in writing of the departmental recommendation and of the "substance" of departmental evaluations. The candidate has the right to comment in writing on the departmental recommendation.

The matter is then reviewed by an ad hoc review committee nominated by the Committee on Academic Personnel and appointed by the chancellor. The recommendation and report of the ad hoc committee is forwarded to the Committee on Academic Personnel, which adds its own comments and submits the file together with its recommendation to the chancellor. The Chancellor then makes the final decision. The candidate has the right to require the chancellor to state his reasons in writing, including "a comprehensive summary of the substance of the confidential documents in the personnel review file."[4]

In the event tenure or promotion is denied, the candidate has the right to request the University Committee on Privilege and Tenure to review the decision. The systemwide bylaws of the academic senate provide that complaints to this committee may be based only on allegations "that the procedures were not in consonance with the applicable rules and requirements of the University or any of its Divisions" or "that the challenged decision was reached on the basis of impermissible criteria, including (but not limited to) race, sex, or political conviction." While the Committee on Privilege and Tenure is empowered to determine the validity of complaints, it is "not . . . empowered to reevaluate the academic qualifications or professional competence of the complainant." If, after investigation, the committee decides to conduct a hearing, the complainant may be represented by counsel, may offer documentary evidence and may examine and cross-examine witnesses.

I.

The parties endeavor to persuade us either of the merits or the demerits of the process just described.

---

[4]The documents deemed "confidential" consist of: (a) letters of evaluation or other statements received by the University with the understanding they will be held in confidence; (b) the letter of the chairperson setting forth the departmental recommendation (though, consistent with departmental policy, the chancellor may disclose the chairpersons' letter, without disclosure of the identities of persons who provided confidential documents); and (c) the reports and recommendations made in the review process.

██ The University insists that, as stated in the academic personnel manual, "[c]onfidential evaluations are . . . necessary in order to make effective the continuing effort and obligation to preserve and increase the quality of the academic personnel of the University." The manual states that without confidentiality "there is substantial likelihood that qualified evaluators would refuse to provide evaluations, or would provide bland and non-candid, and therefore far less useful evaluations." The University also claims that the process provides candidates access to the most essential information and an adequate means of reviewing adverse determinations. Finally, the University stresses that the challenged procedures are fully in accord with the standards advocated by the American Association of University Professors (AAUP)—assertedly "the authoritative voice of the academic profession"[5]—whose recommended procedures do not require disclosure of the text of peer evaluations.[6]

Appellants advance a very different view, emphasizing the inadequacy of summary descriptions of evidence, as well as the fact that some crucial evidence—such as the separate letter of the chairperson of the department —is not even summarized by the University. Appellants suggest that nondisclosure protects and perpetuates discriminatory behavior, urging that a person under review cannot show a particular review is unfair or false, or that certain opinions deserve more weight than others, without knowing the identities of his or her evaluators. Additionally, appellants claim that reviewers have no reasonable expectation of confidentiality, as the danger of leaks is well known. Finally, appellants argue that openness in the academic review process prevails at many universities, which provide candidates for tenure and promotion the names of their evaluators and the actual text of their views, not just a summary. Appellants rely on studies indicating that reviewers rarely refuse to evaluate or hold back their criticism in open file systems and that the quality of evaluation improved at institutions that provided open access after previously refusing to divulge the identities of evaluators.

Sharing the salutary judicial disposition to yield to the judgment of academics regarding the assessment of scholarship, (see, e.g., *Board of*

[5]For the historical role of the AAUP in the development of standards regarding academic tenure see the articles and bibliography collected in Van Alstyne (ed.) *Freedom and Tenure in the Academy: The Fortieth Anniversary of the 1940 Statement of Principles*, 53 Law & Contemp. Probs. 1 (Summer 1990).

[6]The AAUP's *Preliminary Statement on Judicially Compelled Disclosure* was adopted and summarized in *Gray v. Board of Higher Educ., City of New York* (2d Cir. 1982) 692 F.2d 901, 907. To the extent they bear upon the confidentiality of faculty peer evaluations, these principles appear also to be consistent with a policy that has been followed at Stanford University, with which the University of California is often compared. (*Board of Trustees* v. *Superior Court* (1981) 119 Cal.App.3d 516, 526 [174 Cal.Rptr. 160].)

*Curators, Univ. of Mo.* v. *Horowitz* (1978) 435 U.S. 78, 90 [55 L.Ed.2d 124, 135, 98 S.Ct. 948]; *Megill* v. *Board of Regents of State of Florida* (5th Cir. 1976) 541 F.2d 1073, 1077; *Faro* v. *New York University* (2d Cir. 1974) 502 F.2d 1229, 1231-1232; *Johnson* v. *University of Pittsburgh* (W.D.Pa. 1977) 435 F.Supp. 1328, 1354; *Lewis* v. *Chicago State College* (N.D.Ill. 1969) 299 F.Supp. 1357, 1360), we decline to evaluate the competing contentions just described, as the dispute is, at bottom, one of policy. Our analysis focuses narrowly upon the specific legal issues that have been raised. We begin with the statute addressed to peer review at the University.

## II.

Section 92612, enacted in 1978, provides in subdivision (a) that "Every individual shall have the right of access to all personal information, as defined in subdivision (b) of section 1798.3 of the Civil Code, contained in any employee record which is maintained by the University of California which pertains to the individual."[7]  Subdivision (b) of section 92612 provides that if any "letters of recommendation" or "reports of faculty review committees" compiled for the purpose of determining fitness of academic personnel for advancement "is received with the promise or understanding that the identity of the source of the information would be held in confidence, the university shall provide a copy of the text of such information to the individual to whom the information pertains with only the deletion of the name and affiliation, if any, of the source."

The University objects to the statute because it believes redaction of the "name and affiliation" of an evaluator does not preserve confidentiality. As stated by the University in its brief, "[t]ypically there is a relationship between the evaluator and the candidate which will be reflected in evaluations (e.g., 'When Dr. Brown was a doctoral student working in my laboratory, etc.') and which will readily identify the source. Also, distinctive writing styles will often disclose the identity of the writer, particularly in the relatively small world of academia." Moreover, the University contends it is not bound by section 92612 because judgments as to whether confidentiality is essential and, if so, how best to preserve it have been constitutionally committed to the Regents, not the Legislature.

Article IX, section 9, of the California Constitution provides that "The University of California shall constitute a public trust, to be administered by

---

[7]Section 1798.3 of the Civil Code is a part of the Information Practices Act. The definition of "personal information" formerly set forth in subdivision (b) of that statute is now contained in subdivision (a) thereof, which provides as follows: "The term 'personal information' means any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history. It includes statements made by, or attributed to, the individual."

the existing corporation known as 'The Regents of the University of California,' *with full powers of organization and government,* subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable to the university by statute for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services. . . ." (Italics added.)

Our Supreme Court has on several occasions explained that the broad powers conferred upon the University under California Constitution, article IX, section 9 provide it general immunity from legislative regulation. "[T]he University is intended to operate as independently of the state as possible." (*Regents of University of California* v. *Superior Court* (1976) 17 Cal.3d 533, 537 [131 Cal.Rptr. 228, 551 P.2d 844].) " ' "[T]he power of the Regents to operate, control, and administer the University is virtually exclusive." ' " (*San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 788 [163 Cal.Rptr. 460, 608 P.2d 277], quoting *Regents of University of California* v. *Superior Court* (1970) 3 Cal.3d 529, 540 [91 Cal.Rptr. 57 [476 P.2d 457], quoting 30 Ops.Cal.Atty.Gen. 162, 166 (1957).)

Apart from the forms of legislative control specifically authorized in California Constitution, article IX, section 9, there are only three areas in which the University is not free from legislative regulation. "First, the Legislature is vested with the power of appropriation, preventing the Regents from compelling appropriations for salaries. [Citations.] [¶] Second, it is well settled that general police power regulations governing private persons and corporations may be applied to the university. [Citations.] For example, workers' compensation laws applicable to the private sector may be made applicable to the university. [¶] Third, legislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs. [Citation.]" (*San Francisco Labor Council* v. *Regents of University of California, supra,* 26 Cal.3d at p. 789.) Appellants contend that section 92612 falls within the second and third categories.

According to appellants, section 92612 is an exercise of the state's "general police power" within the second category even though it applies only to the University because it is substantially similar to other statutes protecting employees in the private and public sectors. *San Francisco Labor Council* v. *Regents of University of California, supra,* 26 Cal.3d 785, is most instructive on this question. There, the court found that section 92611, which directs the Regents to fix minimum salaries for certain employees at or above the prevailing wage rates in various localities, conflicted with article

IX, section 9 of the California Constitution. The court observed that, although "the Legislature and some local agencies have adopted statutes and ordinances requiring payment of prevailing wages by some governmental agencies and some of their contractors, a number of governmental agencies are not required to pay the prevailing wage. [Citation.] There is no showing that prevailing wage requirements have been made generally applicable to private persons and corporations." (26 Cal.3d at p. 790.) Appellants rely upon *San Francisco Labor Council* because in striking section 92611 the court did not rely on the fact that, like section 92612, it applies only to the University. Nevertheless, overall, the court's analysis is inconsistent with appellants' position.

The array of diverse and conflicting state statutes pertaining to employee inspection of personnel files is as disparate as those pertaining to the prevailing wage and does not constitute a coherent state scheme uniformly applicable to public and private employers. Private employers and many public employers (other than state agencies and public school districts) are not required to provide employees letters of reference. (Lab. Code, § 1198.5, subd. (c).) Most state agencies are permitted to provide a "comprehensive summary" of information compiled for the purpose of determining suitability for employment or promotion that was received with the understanding it would be held in confidence. (Civ. Code § 1798.38.) Significantly, private universities and colleges, which are subject to the general statute regarding inspection of personnel files (Lab. Code, § 1198.5), may refuse to disclose peer review information and are not required to provide summaries of information withheld. (*Board of Trustees* v. *Superior Court, supra,* 119 Cal.App.3d 516.) Thus, for reasons that are not apparent, section 92612 subjects the University of California to a different and more restrictive regulation regarding disclosure than applies to most other employers in the public and private sectors.[8] Section 92612 is not the sort of generally applicable police power regulation that may be applied to the University. It is as much in conflict with article IX, section 9 of the California Constitution, as the statute stricken in *San Francisco Labor Council.*

To be sure, a powerful state interest within the police power of the state which cannot be effectuated without application to the University will override a parochial concern of the University. Thus, for example, a statute prohibiting the matriculation of unvaccinated persons at all institutions of

---

[8]Peace officers, who are subject to much more unsolicited public criticism than most employees, are the only public or private employees who have a greater right of disclosure than is accorded under section 92612. Pursuant to the Public Safety Officers Procedural Bill of Rights (Gov. Code, § 3300 et seq.) adverse information cannot be placed in the personnel file of a public safety officer unless the officer has "first read and signed the instrument containing the adverse comment indicating he is aware of such comment." (Gov. Code, § 3305.)

higher learning would prevail over a University regulation dispensing with such a requirement. (See *Wallace* v. *Regents, etc.* (1925) 75 Cal.App. 274, 278 [242 P. 892].) Although the statute relates to the admission of students, a matter ordinarily within the exclusive domain of the University, the need for uniform application and universal enforcement of an important health measure justifies a relatively minor intrusion into the prerogatives of the University. But that is very different from the situation presented by this case. As indicated, the statute with which we are here concerned applies only to the University, is more restrictive than most other state statutes that regulate in this area, and constitutes a very significant intrusion into the academic arena.

As noted, appellants also maintain that section 92612 fits within the third area identified in *San Francisco Labor Council* in which the University is subject to legislative regulation. Although they concede the statute relates to internal university affairs, they claim section 92612 does not impair the constitutional autonomy of the University because it regulates a matter of statewide concern not *"merely"* or *"exclusively"* involving internal university affairs. This argument is not supported by *Tolman* v. *Underhill* (1952) 39 Cal.2d 708 [249 P.2d 280], upon which appellants rely.

The petitioners in *Tolman* took the oath required of all state employees by statute (Gov. Code, § 18150) and the state Constitution (art. XX, § 3) but were unwilling to make the additional formal acknowledgment, required by the Regents, "that I am not a member of the Communist Party or any other organization which advocates the overthrow of the Government by force or violence . . . ." (39 Cal.2d at p. 709.) The court ruled that "state legislation has fully occupied the field and that university personnel cannot properly be required to execute any other oath or declaration relating to loyalty than that prescribed for all state employees." (*Id.*, at p. 710.)

Answering the Regents' contention that the state legislation was inapplicable to university personnel because of the autonomy conferred on the university under California Constitution article IX, section 9, the Supreme Court uttered the words now seized upon by appellants: "It is well settled . . . that laws passed by the Legislature under its general police power will prevail over regulations made by the regents with regard to matters which are not *exclusively* university affairs. [Citations.] There can be no question that the loyalty of teachers at the university is not *merely* a matter involving the internal affairs of that institution but is a subject of general statewide concern." (*Tolman* v. *Underhill, supra,* 39 Cal.3d at p. 712, italics added.) Appellants' attempt to draw an analogy between the statute involved in *Tolman* and section 92612 does not succeed.

As earlier noted, unlike the statute in *Tolman,* section 92612 applies only to employees of the University of California and is significantly different

from other state statutes pertaining to employee inspection of their personnel files. Additionally, and perhaps most importantly, the evaluation of scholarship and the grant or denial of tenure or promotion, unlike the ascertainment of loyalty, is a defining act of singular importance to an academic institution.[9] As one court has stated, "the peer review process is essential to the very lifeblood and heartbeat of academic excellence and plays a most vital role in the proper and efficient functioning of our nation's colleges and universities." (*E.E.O.C.* v. *University of Notre Dame Du Lac* (7th Cir. 1983) 715 F.2d 331, 336.) The process of peer review, which is closely related to academic freedom (Brown & Kurland, *Academic Tenure and Academic Freedom*, 53 Law & Contemp. Probs. 325 (Summer 1990)), is undoubtedly more essential to the separate and independent existence of the University than some acts that have been found to be within the self-governing authority of the University, such as the fixing of minimum salaries (*San Francisco Labor Council* v. *Regents of University of California, supra*, 26 Cal.3d 785), and is of comparable academic importance to the establishment of the educational curriculum, long ago found to be within the full power and authority of the Regents. (*Hamilton* v. *Regents of the Univ. of Calif.* (1934) 219 Cal. 663 [28 P.2d 355], affd. 293 U.S. 245 [79 L.Ed. 343, 55 S.Ct. 197]; see also, *Searle* v. *Regents of University of California* (1972) 23 Cal.App.3d 448 [100 Cal.Rptr. 194].) As stated in one of the leading treatises on the subject of the autonomy of the University of California, "[c]entral functions of the University, as a university, as distinguished from the central functions of the legislative, executive and judicial branches of state government, and as distinguished from the University's 'non-university' functions, would encompass the academic aspects of administration of the University. *Included, for example, would be such matters as . . . [the] establishment of policies and procedures concerning selection, retention, and conditions of employment of academic personnel . . . .*" (Horowitz, *The Autonomy of the University of California Under the State Constitution* (1978) 25 UCLA L. Rev. 23, 37, italics added.)

The judgment of the trial court that section 92612 impermissibly conflicts with article IX, section 9, of the California Constitution was manifestly correct.

---

[9]The AAUP's 1940 Statement of Principles on Academic Freedom and Tenure, perhaps the most enduring prescriptive dictum in the field of American higher education (Metzger, *The 1940 Statement of Principles on Academic Tenure and Freedom*, 53 Law & Contemp. Probs. 3 (Summer 1990)) proclaims that "[t]enure is a means to certain ends; specifically: (1) Freedom of teaching and research and of extramural activities and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society."

## III.

Appellants contend that the trial court erred in granting summary adjudication regarding the constitutional claims because there are triable issues of material fact as to whether the challenged peer review procedure denied appellants due process of law or violated their rights of privacy. (Code Civ. Proc., § 437c, subd. (c).) We address the constitutional issues separately.

### A.

■    The trial court's determination that appellants established no property or liberty interests that would give rise to a right of due process was predicated on *Board of Regents* v. *Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701] and *King* v. *Regents of University of California* (1982) 138 Cal.App.3d 812 [189 Cal.Rptr. 189].)

*Roth* involved an assistant professor at a state university hired for a fixed term of one academic year. Under state law he could acquire tenure only after four years of year-to-year employment. A teacher who had acquired tenure was entitled to continued employment "during efficiency and good behavior." A teacher without tenure was entitled to nothing beyond his or her one-year appointment. Roth alleged, inter alia, that the university's failure to advise him of the reason for its decision to terminate him after one year infringed his rights to procedural due process under the Fourteenth Amendment. The court held that the Fourteenth Amendment does not require a pretermination hearing absent a showing that the teacher was thereby deprived of an interest in "liberty" or that he or she had a "property" interest in continued employment. According to the court, "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." (408 U.S. at p. 575 [33 L.Ed.2d at p. 560].) The state did not make any charge against Roth "that might seriously damage his standing and associations in his community." (*Id.*, at p. 573 [33 L.Ed.2d at p. 558].) Nor did it impose on him "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." (*Ibid.* [33 L.Ed.2d at p. 559].) Roth lacked a sufficient interest in "property" because he had no "legitimate claim of entitlement" to reemployment under the terms of his contract with the university, but merely "an abstract concern in being rehired." (*Id.*, at pp. 577-578 [33 L.Ed.2d p. 561].)

*King* v. *Regents of University of California, supra,* 138 Cal.App.3d 812, and *Chang* v. *Regents of University of California* (1982) 135 Cal.App.3d 88 [185 Cal.Rptr. 167], involved facts very similar to those of *Roth* and reached the same result.

Appellants seek to factually distinguish the present case from *Roth, King* and *Chang*, first, because the denial of tenure does prevent them from obtaining employment elsewhere and does result in stigmatization, thus abridging their "liberty." They claim, additionally, that University policy created a reasonable expectancy tenure would be granted, which in turn gave rise to a property right. According to appellants, these are triable issues of material fact.

The only indication that denial of tenure prevented appellants from obtaining other employment consists of a University policy that an assistant professor denied tenure after an eight-year probationary period cannot thereafter be appointed as an assistant professor at any *other campus of the University.* Clearly, this is not the sort of disability the Supreme Court had in mind when it indicated that a denial of reemployment that forecloses the "freedom to take advantage of other employment opportunities" (*Board of Regents* v. *Roth, supra,* 408 U.S. at p. 573 [33 L.Ed.2d at p. 559]) may constitute an abridgement of "liberty" within the meaning of the Fourteenth Amendment. We are not prepared to depart from the holding in *King* v. *Regents of University of California, supra,* 138 Cal.App.3d 812 that denial of tenure by the University of California does not deprive a person of the "ability to seek other employment in his profession" or otherwise remove or damage his or her professional status. (*Id.,* at pp. 817-818.)

Nor are we persuaded by appellants' claim that the denial of tenure is stigmatizing because of the "great prestige" of the University. The prestige of any institution of higher learning is to a great extent a reflection of the eminence of its faculty; that is, the standards it imposes in the process of academic peer review. The failure to secure a tenured position at the University—where the standards are exceedingly high—is therefore presumably *less* stigmatizing than would be the failure to obtain tenure at a less prestigious institution where it is more easily acquired. Thus, if we were to agree that the denial of tenure or promotion by the University was sufficiently stigmatizing as to amount to a deprivation of an interest in liberty within the meaning of the Fourteenth Amendment, it would necessarily follow that the denial of tenure or promotion by almost any college or university would have the same consequence. Such a result simply cannot be squared with the holding in *Roth.*

Appellants' attempt to show that a property interest is at stake in this case is also unavailing. In effect, appellants try to draw an analogy between the facts of this case and those of *Perry* v. *Sindermann* (1972) 408 U.S. 593 [33 L.Ed.2d 570, 92 S.Ct. 2694], decided by the Supreme Court on the same day as *Roth.* In *Sindermann* the respondent's continued interest in employment at a junior college was found to rise to the level of an entitlement because of a

provision of the colleges's official "Faculty Guide" stating that " '[t]he Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work.' " (*Id.*, at p. 600 [33 L.Ed.2d at p. 579].) The University's policies on tenure and promotion do not remotely resemble that in *Sindermann.* The record in this case provides no reason to believe that, if permitted to do so, appellants could factually establish that academic employees of the University have a legitimate claim of entitlement to tenure or promotion.

### B.

Appellants assertion of the right of privacy is based on the theory that one of the mischiefs the state constitutional right of privacy (Cal. Const., art. I, § 1) was designed to prevent was the use of inaccurate government and business records regarding individuals unaware of or unable to correct erroneous information that might adversely affect them. (See *White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].)[10]

The right to privacy is not absolute, however, but may yield to the furtherance of a strong competing need for disclosure. (*People* v. *Stritzinger* (1983) 34 Cal.3d 505, 511 [194 Cal.Rptr. 431, 668 P.2d 738]; *Doyle* v. *State Bar* (1982) 32 Cal.3d 12, 20 [184 Cal.Rptr. 720, 648 P.2d 942]; *Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 855 [143 Cal.Rptr. 695, 574 P.2d 766].) Further, the privacy rights of individuals being evaluated may conflict with the right to privacy of other participants in the peer review process. After balancing the interests in disclosure of particular academic employees against a university's interest in confidentiality, courts have relied upon the right of privacy not to grant but to *deny* disclosure of information obtained in the peer review process. For example, in *Board of Trustees* v. *Superior Court, supra,* 119 Cal.App.3d 516, after describing arguments for confidentiality virtually identical to those advanced by the University in this case, the court concluded that comments made and votes cast at a Stanford University faculty meeting on tenure "were thus covered by the communicators' constitutional right of privacy." (*Id.,* at p. 528.) Similarly, in *Kahn* v. *Superior*

---

[10]Appellants emphasize that one of the ballot pamphlet arguments in favor of amending the California Constitution to add article I, section 1, claimed it would remedy the "dangerous . . . loss of control over the accuracy of government and business records on individuals. Obviously, if the person is unaware of the record, he or she cannot review the file and correct inevitable mistakes. Even if the existence of this information is known, few government agencies or private businesses permit individuals to review their files and correct errors." (The ballot pamphlet arguments in support of the constitutional amendment and the rebuttals are set forth in *Roberts* v. *Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 791, fn. 15 [195 Cal.Rptr. 393].)

*Court* (1987) 188 Cal.App.3d 752 [233 Cal.Rptr. 662], a candidate denied a permanent appointment at Stanford filed an action for defamation and tortious interference with an advantageous business relationship against a tenured professor. The candidate claimed the professor persuaded the department to deny tenure on nonacademic grounds, though the complaint made no claim of discrimination and the candidate was given a comprehensive summary of the reasons tenure was denied. The trial court allowed the candidate to take the deposition of the professor for the sole purpose of inquiry into his statements, motives and conduct in connection with the review and evaluation of the candidate's application. The Court of Appeal set this order aside, concluding that even though " 'academic freedom' may be used to shield nonacademic and insidious motives for denying tenure[,] . . . in California the fostering of academic excellence finds support in the constitutional right to privacy." (*Id.*, at pp. 769-770.) Finally, in *King* v. *Regents of University of California, supra,* 138 Cal.App.3d 812, the court also concluded that "the university's need to maintain confidentiality outweighs any marginal benefit to appellant from disclosure of the names of his evaluators" (*id.*, at p. 819), though the court did not in that case specifically invoke the privacy provision of the California Constitution.

In all three of the cases just described the university's need for confidentiality was found to prevail over the interest in disclosure of information pertaining to a single individual. Such limited disclosure would not significantly have compromised the university's overall interest in confidentiality. The nature of the information sought by appellants in this case is not in substance very different from that sought in the cases just discussed; such disclosure would much more thoroughly undermine confidentiality, however, because it pertains to *all* academic employees seeking tenure or promotion. Accordingly, there is an even more compelling reason to reject appellants' contention.

### C.

The motions for summary adjudication of issues filed by the University and interveners simply asked the trial court to determine whether "the established procedures of the University of California for the evaluation and promotion of faculty . . . violate the due process clause of the United States Constitution [and/or] . . . Article I, Section 1 of the California Constitution." The general nature of the requested ruling distinguishes this case from others that have addressed the constitutional questions and bears upon the question whether there existed any triable issues of material fact.

The right of academic employees to disclosure of information obtained in the process of peer review has chiefly been litigated in cases commenced

under title VII of the Civil Rights Act of 1964, 42 United States Code section 2000e-2(a), as amended. Although title VII originally did not apply to educational institutions, this exemption was eliminated in 1972, as a "considered response to the widespread and compelling problem of invidious discrimination in educational institutions." (*University of Pennsylvania* v. *EEOC* (1990) 493 U.S. 182 [200 L.Ed.2d 571, 582, 110 S.Ct. 577, 582].) Thus, federal courts that have ordered disclosure have felt that deferring to a university's claim of confidentiality would subvert enforcement of the policy against discrimination, which Congress has indicated is of the "highest priority." (*Alexander* v. *Gardner-Denver Co.* (1974) 415 U.S. 36, 47 [39 L.Ed.2d 147, 158, 94 S.Ct. 1011]; see, e.g., *University of Pennsylvania* v. *EEOC, supra*; *E.E.O.C.* v. *Franklin & Marshall College* (3d Cir. 1985) 775 F.2d 110; *In re Dinnan* (5th Cir. 1981) 661 F.2d 426, cert. den. *sub nom. Dinnan* v. *Blaubergs* (1982) 457 U.S. 1106 [73 L.Ed.2d 1314, 102 S.Ct. 2904]; *Kunda* v. *Muhlenberg College* (3d Cir. 1980) 621 F.2d 532; *Powell* v. *Syracuse University* (2d Cir. 1978) 580 F.2d 1150, cert. den. 439 U.S. 984 [58 L.Ed.2d 656, 99 S.Ct. 576]; compare, *E.E.O.C.* v. *University of Notre Dame Du Lac, supra,* 715 F.2d 331, *Gray* v. *Board of Higher Educ., City of New York, supra,* 692 F.2d 901.) Because appellants have not invoked federal or state antidiscrimination statutes the need for confidentiality is not here pitted against the strong policy that compelled many courts to compel disclosure.

In ruling on the motions for summary adjudication, the trial court understood that it was, in effect, being asked to determine the facial constitutional validity of the peer review process described in the University's academic procedure manual; it was not required to rule on the operation of that process in any particular instance. Because the disputed factual issues identified by appellants related to particular applications of the procedures not relevant to the question of facial validity (such as the adequacy of a "comprehensive summary" provided a certain candidate), and because there was no dispute as to the procedural prescriptions in issue, the trial court properly rejected appellants' argument that summary adjudication should not be granted because there were triable issues of material fact.

The recent opinion of the United States Supreme Court in *University of Pennsylvania* v. *EEOC, supra,* 493 U.S. 182, does not mean, as appellants appear to believe, that the dispute in this case as to whether confidentiality is essential to academic excellence is material to the constitutional questions. Like most of the federal cases ordering disclosure of peer review information, *University of Pennsylvania* was a title VII enforcement proceeding. Finding that there is neither a qualified common law privilege against disclosure of confidential peer review materials nor a First Amendment right of "academic freedom" against the disclosure of such documents, the Su-

preme Court held that a university does not enjoy a special privilege requiring a judicial finding of particularized necessity of access, beyond a showing of mere relevance, before peer review materials pertinent to charges of discrimination in tenure decisions are disclosed to the government agency charged with enforcing title VII. In the course of reaching this result the court expressed doubt about the validity of the claim that confidentiality is essential to the achievement of academic excellence. Noting that "confidentiality is not the norm in all peer review systems" (*id.*, at p. 200 [107 L.Ed.2d at p. 589, 110 S.Ct. at p. 588]), the court was "not so ready as [the university] seems to be to assume the worst about those in the academic community. Although it is possible that some evaluators may become less candid as the possibility of disclosure increases, others may simply ground their evaluations in specific examples and illustrations in order to deflect potential claims of bias or unfairness. Not all academics will hesitate to stand up and be counted when they evaluate their peers." (*493 U.S. at pp. 200-201* [107 L.Ed.2d at p. 589, 110 S.Ct. at p. 588].)

The foregoing language simply expressed the view of the court that the disclosure of *materials relevant to charges of racial or sexual discrimination* will not likely be as harmful to academic interests as had been claimed. The disclosure was not ordered because of a determination that confidentiality was unnecessary,[11] but because of the strong policy of facilitating enforcement of title VII of the Civil Rights Act. *University of Pennsylvania* certainly does not suggest that a university must factually establish that confidentiality is essential to overcome a constitutional challenge to its peer review process. (See *Bishop* v. *Wood* (1976) 426 U.S. 341, 349-350 [48 L.Ed.2d 684, 692-693, 96 S.Ct. 2074].)

As stated above, we are not called upon in this case to decide whether the University's procedures are necessary or wise. Aware that reasonable minds can differ with the judgment of the University that a more open peer review review process is inappropriate (see, e.g., Gregory, *Secrecy in University and College Tenure Deliberations: Placing Appropriate Limits on Academic Freedom* (1983) 16 U.C.Davis L.Rev. 1023), we determine only that the evaluation of academic personnel is within the area of autonomy granted the University under article IX, section 9 of the California Constitution and that the challenged procedures do not on their face violate the due process clause of the United States Constitution or the privacy provision of the California Constitution.

---

[11]Indeed, though it ordered disclosure, the Supreme Court did not consider the question, not passed upon by the Court of Appeals, "whether the District Court's enforcement of the [EEOC's] subpoena will allow [the University] to redact information from the contested materials before disclosing them." (*University of Pennsylvania, supra,* 493 U.S. at p. 202, fn. 9 [107 L.Ed.2d at p. 590, 110 S.Ct. at p. 589].)

The judgment is affirmed.

Smith, J., and Benson, J., concurred.

A petition for a rehearing was denied October 29, 1991, and appellants' petition for review by the Supreme Court was denied January 8, 1992.