Anthony M. PAGANO, M.D., Plaintiff,

v.

OROVILLE HOSPITAL, Miki R. Joy and John Floyd, M.D., Defendants.

No. CIV S-92-0324 GEB GGH.

United States District Court, E.D. California.

Feb. 2, 1993.

Thomas Duane Phillips, Wilson Law Firm, Sacramento, CA, for plaintiff.

Daryl E. Kennedy, Moss & Enochian, Redding, CA, for defendants.

## ORDER

HOLLOWS, United States Magistrate Judge.

Previously pending on this court's law and motion calendar for January 7, 1993, was plaintiff's motion to compel production of documents and further answers to interrogatories. The parties filed a timely stipulation regarding their discovery disagreement, pursuant to E.D.Cal.R. 251(c). The court has carefully reviewed the moving papers and heard oral argument, and hereby issues the following order.

### BACKGROUND

The underlying complaint alleges antitrust violations under the Sherman Act, 15 U.S.C. § 1, against defendant Oroville Hospital, and defendants Miki Joy, M.D. and John Floyd, M.D., based on allegations of conspiracy to eliminate plaintiff as a competitor in providing obstetrical/gynecological services in the Oroville area. It also alleges that the "Corrective Action" peer review procedure employed by defendants with respect to plaintiff did not comply with the requirements of 42 U.S.C. § 11112, of the Health Care Quality Improvement Act. The complaint further alleges that the Hospital intentionally interfered with plaintiff's contractual relations, based on the hospital's alleged interference with plaintiff's professional liability carrier resulting in the cancellation of plaintiff's liability insurance.

The "Corrective Action" pertaining to plaintiff was initiated by the Hospital in October, 1989. An "ad hoc" committee appointed by the Executive Credentials Committee of the Hospital recommended that plaintiff's gynecological surgical privileges be immediately terminated. This recommendation was upheld by the Executive Credentials Committee. Plaintiff was unsuccessful in his appeal of the decision to a "hearing committee" of the Committee, and did not appeal to the Hospital's Board of Trustees.

The Hospital's Executive Credentials Committee also directed a review of plaintiff's obstetrical practice. In March 1990, the Committee directed that plaintiff follow certain procedures and participate in a follow-up review. In May 1990, the Committee imposed a requirement that plaintiff complete a retraining course within six months. Plaintiff requested an extension of this period, which was recommended by the Committee, but rejected by the Board of Trustees.

Plaintiff's hospital privileges were considered "voluntarily surrendered" as of November, 1990. Plaintiff's liability insurance was cancelled in 1991, and plaintiff has been unable to obtain replacement insurance.

Defendants Joy and Floyd sat on the Hospital Board of Trustees and its Executive Credentials Committee.

Plaintiff filed the complaint in this action on February 28, 1992. On May 27, plaintiff served on defendant Hospital a First Set of Interrogatories and Request for Production of Documents. On June 27, 1992, the Hospital served its responses. The parties have since conferred on several occasions to resolve unanswered discovery requests. On January 5, 1993, the parties filed their Joint Stipulation regarding their disputes on the following unanswered interrogatory and three requests for production:

1. *Interrogatory No. 13:*

"Identify by date, name, address and telephone number of complainant, the nature of the procedure which was the subject of the complaint, and the surgeon or surgeons performing the procedure, all complaints received by the Hospital regarding any obstetrical or gynecological surgical procedure performed at the hospital, 1987–1990."

2. *Request for Production No. 26:*

"All documents relating to any legal action brought against the Hospital as a result of surgery performed at the Hospital by a surgeon or surgeons other than Plaintiff, 1987–1990."

3. *Request for Production No. 27:*

"All documents reflecting, regarding, relating or referring to any complaints to the

Hospital regarding any obstetrical or gynecological surgical procedure performed at the Hospital, 1987–1990."

4. *Request for Production No. 28:*

"All documents reflecting, regarding, relating or referring to any complaints to the Hospital regarding any other surgical procedure performed at the Hospital, 1987–1990."

Defendant Hospital provided similar objections to each of these requests. To all of the requests, the Hospital asserted (a) the physician-patient privilege, and (b) the privacy rights of the Hospital, its physicians and patients. To all of the requests except Request for Production No. 28, the Hospital asserted (c) immunity from discovery for the proceedings of its peer review committees, pursuant to the holdings of *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970), *aff'd* without opinion, 479 F.2d 920 (D.C.Cir.1973), and *Laws v. Georgetown University Hospital*, 656 F.Supp. 824 (D.D.C.1987). To all of the requests for production, but not the outstanding interrogatory, the Hospital asserted (d) irrelevance, (e) the attorney-client privilege, and (f) the attorney work-product privilege. To the request for Production No. 26, the Hospital asserted (g) that the information is contained in public documents otherwise available to plaintiff.

*DISCUSSION*

I. OVERVIEW

The requested material is clearly relevant to plaintiff's cause of action. The more difficult question is the extent to which disclosure should be precluded based on one or more of defendant's asserted evidentiary privileges. Defendant relies on a number of privileges—both federal and state—to object to the requested discovery. Some of these privileges intersect, others

are parallel and distinct, but each invokes a threshold determination of applicability. Defendant's broad challenge has necessitated refinement of this court's approach in determining when to apply state privilege law.

■ This case involves a federal antitrust claim under the Sherman Act, and a pendent state law claim of interference with contract. The Federal Rules of Evidence dictate that privileges asserted in federal question cases shall be governed by federal law, while state privilege law should apply to purely state claims brought in federal court pursuant to diversity jurisdiction. Fed.R.Evid. 501.[1] State claims that are pendent to federal question cases, however, are governed not by state law but by federal privilege law. *Wm. T. Thompson, Co. v. General Nutrition Corp., Inc.*, 671 F.2d 100, 104 (3rd Cir.1982); *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 458–459 (N.D.Cal.1978). Thus, both claims of plaintiff in this action are governed by federal privilege law.

The Federal Rules of Evidence provide that privileges asserted in federal question cases shall be governed by principles of federal common law, unless otherwise prescribed by the federal Constitution, an Act of Congress, or rules of the Supreme Court. Fed.R.Evid. 501. Nevertheless, application of federal law is not so wooden as to preclude all reference to analogous state law.

In federal question cases the clear weight of authority and logic supports reference to federal law on the issue of the existence and scope of an asserted privilege. *Heathman v. U.S. Dist. Court for Central Dist. of California*, 503 F.2d 1032, 1034 (9th Cir.1974); *Kerr v. U.S. Dist. Court for Northern Dist. of California*, 511 F.2d 192, 197 (9th Cir.1975), *aff'd*, 426

---

1. Fed.R.Evid. 501 provides in full:
   Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by

the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). Nonetheless, "as a matter of comity, federal courts should attempt to ascertain what interests inspire relevant state doctrine and should take into account the views of state authorities about the importance of those interests." *Kelly v. City of San Jose*, 114 F.R.D. 653, 656 (N.D.Cal. 1987). "'A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial costs to federal substantive and procedural policy.' *United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y.1976). And where a 'state holds out the expectation of protection to its citizens, they should not be disappointed by a mechanical and unnecessary application of the federal rule.' *Lora v. Board of Education*, 74 F.R.D. 565 (E.D.N.Y.1977)." *Memorial Hospital For McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir.1981). *See also, Gottlieb v. Wiles*, 143 F.R.D. 235, 237 (D.Colo. 1992).

■ These considerations lend themselves to a well-defined approach for determining the applicability of state privileges to federal question cases.[2] The initial determination is whether application of the state law would be inconsistent with federal law. When there is a clear inconsistency—for example, the state privilege is absolute in its application while the federal privilege is qualified, or the federal courts have explicitly rejected a federal privilege analogous to an asserted state privilege—state privilege law should not apply. However, when state privilege law is consistent, or at least compatible, with federal privilege law, the two should be read together in order to accommodate the legitimate expectations of the state's citizens. When a court can harmonize the provisions of state privilege with federal discovery law, it only makes sense to apply the state law.[3] By use of the phrase "apply state law," this court does not intend that it is bound by state law in the first instance, or that only state law may be utilized. Rather, application of state law may be very helpful in determining the proper result for a given issue.

■ It is not necessary to have precise similarity between the federal privilege and state privilege in order to utilize the state law. If such similarity were required, federal law could simply be applied since there would be no difference whatsoever in the two sets of laws. The key to legitimate use of state law is to recognize that state law can be applied as long as it is not *inconsistent* with the nature or degree of federal privilege—some differences can be tolerated without the two privileges being rendered inconsistent. Analogies rarely, completely overlap, and such overlap is not necessary for the application of analogous state privilege law.

Applying this model to the present issues, the court concludes that while it cannot apply California's statutory physician-patient and peer review privileges, California's constitutional right to privacy may be considered in determining the contours of a privilege of nondisclosure.

## II. RELEVANCE

■ The court first considers the relevance of the requested documents. Defendant Hospital objects to all of the requests for production on the ground that they are

---

**2.** Some courts have adopted a broad analytical approach that is not easily applied with any consistency. *See, e.g., LeMasters v. Christ Hospital*, 791 F.Supp. 188, 189–190 (S.D.Ohio 1991) ("because Rule 501 refers to 'reason and experience', courts in federal question cases may *choose to apply state privilege law by analogy* or as a matter of comity").

**3.** The determination whether state privilege law is consistent with federal law must be made by comparing the two bodies of privilege law. It cannot be determined by a comparison between the general principle in federal law of "broad" discovery, *infra,* and the pertinent state privilege. Such a comparison would result in a complete preclusion of the use of state law since privileges by their nature limit otherwise broad discovery parameters. Rather, the pertinent comparison pits specific federal law on the privilege involved with the analogous state privilege. Only when the state privilege is too inconsistent with federal privilege law may no use of the state law be made.

not relevant and not reasonably calculated to lead to relevant or admissible evidence.

■ "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b)(1). This rule is to be considered broadly, to include "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978).

The documents requested by plaintiff are clearly relevant to the underlying action. As plaintiff asserts, "discovery as to complaints and legal actions relating to procedures performed at the Hospital by other physicians and the treatment of the other physicians by the Hospital is directly related to plaintiff's allegations of discriminatory treatment." The relevance of such discovery was explicitly supported in *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d at 1063, an action, like the present one, in which plaintiff doctor alleged antitrust violations under the Sherman Act against defendants hospital and physicians. In *Shadur*, discussed at length, *infra*, the court permitted discovery of the hospital's peer review meetings, stating that to prove his case, "[plaintiff] must present evidence that other physicians with comparable or worse records than his were not denied staff privileges.... To deny [plaintiff] access to this information may very well prevent him from bringing his action altogether." 664 F.2d at 1063.

Accordingly, this court finds that all of plaintiff's requests are relevant to the subject matter involved in this action. Discovery is therefore permissible unless the information and materials sought come within an evidentiary privilege.

## III. PRIVILEGES AND PRIVACY RIGHTS OF THE HOSPITAL, PHYSICIANS, AND PATIENTS

"The party asserting an evidentiary privilege has the burden to demonstrate that the privilege applies to the information in question." *Tornay v. United States*, 840 F.2d 1424, 1426 (9th Cir.1988). The Hospital asserts three interwoven grounds for objecting to plaintiff's discovery requests. These are the physician-patient privilege, the peer review or self-critical analysis privilege, and the privacy rights of the Hospital, its physicians and patients. The court concludes that none of these objections preclude the requested discovery, although the asserted privacy rights provide the rationale for protecting the identities of patients and physicians.

### A. PHYSICIAN–PATIENT PRIVILEGE

■ The Hospital asserts the physician-patient privilege to preclude disclosure of any patient documents responsive to plaintiff's discovery requests absent waiver by the patients involved.

■ The physician-patient privilege is not recognized by federal common law, statute or the Constitution. The Supreme Court has flatly stated that "[t]he physician-patient evidentiary privilege is unknown to the common law. [Citations.]" *Whalen v. Roe*, 429 U.S. 589, 602, n. 28, 97 S.Ct. 869, 877, n. 28, 51 L.Ed.2d 64 (1977). (*But see*, dissent of Chief Justice Burger in *Dept. of Air Force v. Rose*, 425 U.S. 352, 387, 96 S.Ct. 1592, 1611, 48 L.Ed.2d 11 (1976), in which he noted "[t]he law's long established physician-patient privilege.") The Ninth Circuit, while noting "that the Hippocratic tradition of physician non-disclosure of patient secrets is ancient," *In re Grand Jury Proceedings*, 867 F.2d 562, 565 (9th Cir.1989), cert. den., 493 U.S. 906, 110 S.Ct. 265, 107 L.Ed.2d 214 (1989), has also declined to recognize a physician-patient privilege. *Id.*, at 564; *In re Grand Jury Proceedings (Doe)*, 801 F.2d 1164, 1169 (9th Cir.1986). When asked to develop such a rule in deference to, and as a matter of comity with, California's statutory physician-patient privilege, the Ninth Circuit declined, even though it recognized "that Congress intended that the courts have flexibility to develop rules on privileged communications on a case-by-case basis when it enacted Fed.R.Evid. 501." *In*

*re Grand Jury Proceedings,* 867 F.2d at 564.

The physician-patient privilege has been codified by the California Legislature (Cal. Evid.Code §§ 990–1007),[4] although the California courts have noted that this statutory privilege is narrower in scope than the privacy rights accorded by the California Constitution, Article 1, Section 1. *Heda v. Superior Court (Davis)* 225 Cal.App.3d 525, 528, n. 1, 275 Cal.Rptr. 136, 138, n. 1 (1990). This state statutory scheme cannot be applied to the instant federal claim. Since there is no analogous federal privilege, it would be too inconsistent and anomalous with federal privilege law to recognize California's statutory physician-patient privilege.

### ·B. *MEDICAL PEER REVIEW PRIVILEGE*

The Hospital asserts immunity from discovery of information and material generated by its Executive Credentials Committee based on an asserted federal common law "peer review privilege," as set forth in *Bredice v. Doctors Hospital, Inc., supra,* 50 F.R.D. 249, and *Laws v. Georgetown University Hospital, supra,* 656 F.Supp. 824. Plaintiff responds that *Bredice* and *Laws* are distinguishable from the instant case, relying on *Memorial Hospital for McHenry v. Shadur, supra,* 664 F.2d 1058.

For the reasons discussed below, the court finds *Bredice* and *Laws* distinguishable, and *Shadur* controlling. The court observes that there is no clearly recognized federal peer review privilege—either in common law or by statute—that would preclude the requested disclosure. The court further concludes that while there exists a comparable state statutory scheme, it is too absolute in its application and effect, and therefore too inconsistent with federal law, to be held applicable.

### 1. *Federal Common Law*

■ Both *Bredice* and *Laws,* upon which the Hospital relies, are malpractice actions. In *Bredice,* plaintiff sought the minutes and reports of any Board or Committee of defendant hospital or its staff concerning the death of her husband. The District Court for the District of Columbia denied discovery, reasoning that the Hospital was entitled to a qualified privilege precluding disclosure absent a showing of extraordinary circumstances, which had not been demonstrated. The court reasoned that such committees were formed pursuant to the Joint Commissions on Accreditation of Hospitals for the "sole objective" of improving available care and treatment for its patients, a matter of overwhelming public interest; and that all communications originating therein are expected to remain confidential, which is essential to the effective functioning of the committees. 50 F.R.D. at 250–251.

*Laws* extended *Bredice* to preclude disclosure of a single letter, written by defendant doctor to the Chair of defendant's department concerning the alleged malpractice incident; the letter was ultimately reviewed at a hospital staff meeting. The District Court for the District of Columbia denied discovery of the letter, concluding that "the policies motivating the *Bredice* decision are equally present in the present case." 656 F.Supp. at 826.

While *Bredice* has been widely cited and extended to a variety of settings (yet its "vitality" questioned, *see e.g., Robinson v. Magovern,* 83 F.R.D. 79, 86 (W.D.Pa.1979), and cases cited therein; *see also, Wei v. Bodner,* 127 F.R.D. 91, 100–101 (D.N.J. 1989)), it is easily distinguishable. Of particular significance is the holding in *Shadur,* relied upon by plaintiff. As in the present case, a physician filed a Sherman

---

4. Cal.Evid.Code §§ 990–1007 provides in pertinent part: "[T]he patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and physician ..." (*Id.,* § 994.)

"The patient-physician privilege (Evid.Code §§ 990–1007) creates a zone of privacy whose purposes are (1) 'to preclude the humiliation of the patient that might follow disclosure of his ailments' [citations] and (2) to encourage the patient's full disclosure to the physician of all information necessary for effective diagnosis and treatment of the patient [citations]." *Division of Medical Quality v. Gherardini,* 93 Cal. App.3d 669, 678–679, 156 Cal.Rptr. 55, 61 (1979).

Act antitrust action against a group of competing physicians, alleging that they had used the committee apparatus of the hospital as a sham to exclude plaintiff from its medical staff and destroy his practice. Plaintiff sought discovery regarding the hospital's treatment of other physicians in comparable disciplinary proceedings. These proceedings were privileged under an Illinois state statute and disclosure of information obtained in the course of such proceedings was a misdemeanor. The Seventh Circuit nonetheless permitted disclosure, reasoning that state law does not supply the rule of decision as to a federal claim.

The *Shadur* court weighed the need for disclosure of relevant evidence pertaining to plaintiff's antitrust claim with the policy of protecting the effectiveness of hospital peer review committees. The court determined that, unlike in malpractice claims, disclosure was necessary because it was *essential* to plaintiff's claim. The court concluded:

> This case differs from *Bredice v. Doctors Hospital* ... in that it is not a medical malpractice action. To recognize hospital review or disciplinary proceedings as privileged in the context of a malpractice action will generally have little impact upon the plaintiff's ability to prove a meritorious claim. For the crucial issue in that type of case is not what occurred at the review proceeding, but whether the defendant was in fact negligent in his care and treatment of the plaintiff. As the court in *Bredice* went on to note, ' " 'what someone ... at a subsequent date thought of these acts or omissions is not relevant to the case.' " ' [Citation.] ... More importantly, the exclusion of that information will not prevent the plaintiff from otherwise establishing a valid claim.

The same cannot be said, however, in a case such as this where the plaintiff's claim arises out of the disciplinary proceedings themselves and not some event or occurrence that exists independently of those proceedings. In this case, for example, [plaintiff] has alleged that the defendants have used the Hospital committee apparatus discriminatorily to deny him staff privileges at the Hospital in furtherance of an unlawful restraint of trade. To prove this allegation, [plaintiff] must present evidence that other physicians with comparable or worse records than his were not denied staff privileges. Such evidence, if it exists, would likely be found in the Hospital's records of disciplinary proceedings against other doctors. To deny [plaintiff] access to this information may very well prevent him from bringing his action altogether. [Fns. omitted.] *Shadur,* 664 F.2d at 1062–1063.

*Accord, Dorsten v. Lapeer County General Hospital,* 88 F.R.D. 583, 586 (E.D.Mich. 1980) (rejecting application of state statutory privilege in antitrust and sex discrimination case, stating "[i]t is difficult to perceive how any Plaintiff can be expected to argue and prove such a case without access to the type of review and decision-making processes undertaken in comparable situations with Plaintiff's male 'counterparts'.")

This view was subsequently upheld by the Northern District of California, in a case again involving an attempt by plaintiff physician to discover records of a hospital peer review committee in a federal antitrust action. *Teasdale v. Marin General Hosp.,* 138 F.R.D. 691 (N.D.Cal.1991), and *Teasdale v. Marin General Hosp.,* 138 F.R.D. 696 (N.D.Cal.1991). While subsequently acknowledging the similarity of *Shadur,* 138 F.R.D. at 698, the *Teasdale* court considered California's statutory peer review privilege. Cal.Evid.Code § 1157.[5]

---

**5.** *Cal.Evid.Code § 1157 provides in pertinent part:*

(a) Neither the proceedings nor the records of organized committees of medical ... staffs in hospitals, or of a peer review body, as defined in Section 805 of the Business and Professions Code, having the responsibility of evaluation and improvement of the quality of care ren-

dered in the hospital ... shall be subject to discovery.

(b) Except as hereinafter provided, no person in attendance at a meeting of any of those committees shall be required to testify as to what transpired at that meeting.

(c) The prohibition relating to discovery or testimony does not apply to the statements

The court noted that "[f]ederal courts in the Ninth Circuit have yet to adopt California's peer review privilege." 138 F.R.D. at 694.

Both this circuit and the Supreme Court have recently considered—and declined to create—a federal common law peer review privilege. In *University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), petitioner sought disclosure of internal tenure-review files in order to prove her claim of discrimination under Title VII of the Civil Rights Act of 1964. The Supreme Court declined to recognize a "qualified common-law privilege against disclosure of confidential peer review materials." 493 U.S. at 188, 110 S.Ct. at 581. As had the Seventh Circuit in *Shadur*, the *University of Pennsylvania* court narrowly construed its role under Federal Rule of Evidence 501:

> We do not create and apply an evidentiary privilege unless it "promotes sufficiently important interests to outweigh the need for probative evidence ..." Inasmuch as "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that 'the public ... has a right to every man's evidence,'" ... any such privilege must be 'strictly construed.' [¶] "Moreover, although Rule 501 manifests a congressional desire 'not to freeze the law of privilege' but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case basis, we are disinclined to exercise this authority expansively." [Citations]. 493 U.S. at 189, 110 S.Ct. at 582.

The Court went on to note that Congress considered but did not include a peer review privilege when it extended Title VII to educational institutions. *Id.*, at 189–193, 110 S.Ct. at 582–584.

The Ninth Circuit subsequently declined to embrace the analogous privilege of "self-critical analysis." *Dowling v. American Hawaii Cruises, Inc.*, 971 F.2d 423 (9th Cir.1992). Although the Ninth Circuit made an alternative analysis assuming the existence of the privilege, the Ninth Circuit's hesitancy in granting an imprimatur to the peer review/self-critical analysis weighs in favor of finding that federal law does not recognize the privilege.

Observing the reluctance of the Supreme Court to create privileges, and noting that the weight of federal authority has not recognized either a peer review or self-critical analysis privilege, this court will not recognize either privilege in the federal common law, at least in settings where the peer review or self-analysis themselves are under attack.

### 2. Federal Statute

■ There is no federal statutory basis for a medical peer review privilege. The federal Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et seq. (hereafter "HCQIA" or the "Act") does not establish such a broad based privilege.[6] It does accord antitrust liability immunity to medical "professional review" participants whose actions conform to the standards of the Act (*Id.*, § 11111), and protection against extraneous disclosure of confidential information thus generated (§ 11137(b)(1)); however, these protections are based on the assumption that the underlying professional review actions were conducted "in the reasonable belief that the action was in the furtherance of quality health care" (§ 11112(a)). This "integrity" requirement is underscored by the many exceptions to immunity set forth in § 11111, including actions relating to civil rights (including the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Civil Rights Acts, 42 U.S.C. § 1981 et seq.), and the Clayton Act (15 U.S.C. § 15c). While the Act, in asserted purpose and protections, comes close to according a blanket immunity and privilege from disclosure of all medical professional review ac-

made by any person in attendance at a meeting of any of those committees who is a party to an action or proceeding the subject matter of which was reviewed at that meeting, or to any person requesting hospital staff privileges.....

**6.** The Act applies to this case since enacted November 14, 1986, prior to the professional review actions here at issue.

tivities, it intentionally stops short of this. The Act thus infers support of disclosure when the very legitimacy of a medical peer review committee proceeding is at issue.

The HCQIA is set forth as Chapter 117 of the Public Health and Welfare Code, entitled "Encouraging Good Faith Professional Review Activities." It is based, inter alia, on Congressional findings that a nationwide medical malpractice problem can be remedied through concerted professional peer review activities aimed at "restrict[ing] the ability of incompetent physicians to move from State to State." 42 U.S.C. § 11101. The Act establishes a national clearinghouse of reports of professional review actions which adversely affect the clinical privileges or status of physicians (*Id.*, § 11133), reports of sanctions taken by boards of medical examiners (§ 11132), and reports of medical malpractice payments (§ 11131). Hospitals have a duty to obtain this information on a regular basis concerning any physician or licensed health care practitioner for whom they have granted clinical privileges (§ 11135), and such information is also available to other health care entities and licensing boards. In order to "provide incentive and protection for physicians engaging in effective professional peer review," (§ 11101) the Act accords limited liability immunity to professional review bodies, their members and staff. (§§ 11101, 11111).

While a number of courts have addressed the Act's granting of liability immunity to certain medical peer review activities,[7] only a handful have examined its implications regarding discovery. In *Wei v. Bodner, supra*, 127 F.R.D. at 99, the court explicitly found a "federal statutory peer review privilege" in 42 U.S.C. § 11137(b)(1) of the Act.[8] The *Wei* court nonetheless concluded that the privilege did not apply to federal antitrust actions.[9] The court noted the Act's legislative history: "Congress, while attempting to improve medical care, crafted the act to prevent it from being used to hide antitrust violations. 'The bill protects innocent and often helpless consumers from abuses by bad doctors without insulating improper anticompetitive behavior from redress.' [H.R.Rep. No. 903, 99th Cong. reprinted in 1986 U.S.Code Cong. & Admin.News 6287, 6386.] In light of Congress' efforts to prevent the bill from being used to hide antitrust violations, this limited privilege should not be applicable where the plaintiff is alleging precisely that public harm. While this might encourage the filing of antitrust suits to obtain such information, Congress presumably has weighed the costs and benefits of the legislation that it has enacted. It is not for this Court to tip the scales in another direction." *Wei*, 127 F.R.D. at 99–100 (fn. omitted).

Interpreting the statute more narrowly, the court in *LeMasters v. Christ Hospital, supra*, 791 F.Supp. 188, a case

---

**7.** As the United States Supreme Court has noted, the Act "essentially immunizes peer-review action from liability if the action was taken 'in the reasonable belief that [it] was in the furtherance of quality health care.' § 11112(a)." *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988).

**8.** 42 U.S.C. § 11137(b)(1) provides:

Information reported under this subchapter is considered confidential and shall not be disclosed (other than to the physician or practitioner involved) except with respect to professional review activity, as necessary to carry out subsections (b) and (c) of section 11135 of this title (as specified in regulations by the Secretary) [pertaining to the duty of hospitals to obtain such information], or in accordance with regulations of the Secretary promulgated pursuant to subsection (a) of this section [pertaining to access of information to licensing

boards and other health care entities.] Nothing in this subsection shall prevent the disclosure of such information by a party which is otherwise authorized, under applicable State law, to make such disclosure. Information reported under this part that is in a form that does not permit the identification of any particular health care entity, physician, other health care practitioner, or patient shall not be considered confidential. The Secretary (or the agency designated under section 11134(b) of this title), on application by any person, shall prepare such information in such form and shall disclose such information in such form.

**9.** The *Wei* court further concluded that the privilege was inapplicable because defendant Hospital had not reported any information under the Act; moreover, it would not apply to any peer review proceedings concerning Dr. Wei. 127 F.R.D. at 99.

alleging sex discrimination under the Civil Rights Act of 1964, concluded that § 11137(b) of the Act provides for the confidentiality of *only* that information provided to the "national repository" pursuant to the Act. 791 F.Supp. at 191. "[T]he Health Care Quality Improvement Act of 1986 simply serves to create a national repository for information about a physician's past performance. *See Manthe v. Vanbolden,* 133 F.R.D. 497 (N.D.Tex.1991). A hospital may then request information regarding a certain doctor as it proceeds through the hiring or reviewing process. *Id.* The information provided to the repository then remains confidential unless state law permits disclosure. *Id.* Therefore, by its own terms, the Act does not apply to the matter currently before this Court." This court agrees with the *LeMasters* analysis.[10]

These decisions are consistent with the Supreme Court's determination that the Act exempts only limited aspects of medical peer review activities from antitrust *liability* (see note 8, infra). *Patrick v. Burget,* 486 U.S. at 105, n. 8, 108 S.Ct. at 1665, n. 8 and accompanying text. In *Patrick,* the Supreme Court reversed a Ninth Circuit decision (*Patrick v. Burget,* 800 F.2d 1498 (9th Cir.1986)) to hold that Oregon law did not implicate the state-action doctrine to shield medical peer review activities from federal antitrust liability. The court noted that the Ninth Circuit had upheld the state-action exemption even in light of evidence that respondents had improperly used the peer-review process to create a competitive disadvantage against plaintiff rather than to improve patient care. 486 U.S. at 98, 108 S.Ct. at 1661. The court further noted Congress' intent to permit continued application of the antitrust laws to such proceedings.

■ In conclusion, the Health Care Quality Improvement Act does not immun-

ize misuse of the medical peer review process, which would include concerted actions taken for anticompetitive purposes. Nor does the Act preclude discovery aimed at uncovering such actions.

### 3. *State Privilege Law*

■ As earlier noted, California enacted California Evidence Code § 1157 to specifically exclude from discovery the records of medical peer review committees. This statute was enacted in response to the California Supreme Court's decision in *Kenney v. Superior Court,* 255 Cal.App.2d 106, 63 Cal.Rptr. 84 (1967), which permitted a malpractice plaintiff to discover the records of a "medical committee" which investigated the alleged malpractice, although it did not permit disclosure of the identity of the committee members. *West Covina Hosp. v. Superior Court (Tyus),* 41 Cal.3d 846, 853, 226 Cal.Rptr. 132, 135, 718 P.2d 119, 122 (1986). See also *Cedars–Sinai Medical Center v. Superior Court of Los Angeles County,* 12 Cal.App.4th 579, 16 Cal. Rptr.2d 253 (1993) (interpreting Section 1157 to prohibit disclosure of the identities of the medical staff committee members). Liability immunity is accorded by Civil Code § 43.7, to members of hospital committees who perform their duties "within the scope of the functions of the committee." *Ascherman v. San Francisco Medical Society,* 39 Cal.App.3d 623, 662–663, 114 Cal.Rptr. 681, 706–707 (1974).[11]

The statute sets forth an exception permitting disclosure for "any person requesting hospital staff privileges" (Cal.Evid. Code § 1157(c)), which "[t]o all appearances ... was designed to set the immunity to one side and to permit discovery in suits by doctors claiming wrongful or arbitrary exclusion from hospital staff privileges." *Matchett v. Superior Court for County of Yuba,* 40 Cal.App.3d 623, 629, 115 Cal.Rptr. 317, 321 (1974). However, whether a physi-

---

10. *See also, Teasdale v. Marin General Hosp., supra,* 138 F.R.D. at 694. "Congress spoke loudly with its silence in *not* including a privilege against discovery of peer review materials in the HCQIA."

11. California has also enacted a statutory basis for according liability immunity to medical peer review committees and its members (Cal.Civ. Code § 43.7), to individuals who provide information to such committees (*Id.,* § 43.8), and to hospitals for action taken pursuant to a recommendation of such a committee (*Id.,* § 43.97).

cian is a person "requesting hospital staff privileges" within the exception of the statute has been interpreted, literally, to apply only to physicians seeking reinstatement by state administrative mandamus. *California Eye Inst. v. Superior Court*, 215 Cal.App.3d 1477, 1481, 264 Cal.Rptr. 83, 85 (1989). Whether it also applies "only where a physician's hospital staff privileges have been entirely denied, suspended, or terminated" the *California Eye* court declined to resolve, *ibid.*, fn. 3, and no California court has yet addressed.

In the federal courts, this problem was grappled with, but not resolved, in *Teasdale, supra*, 138 F.R.D. 691. There, the Northern District Court of California concluded that California Evidence Code Section 1157 did not preclude plaintiff's discovery in his federal antitrust action, but avoided an express determination of the privilege's applicability. It noted that "because the California remedy of 'administrative mandamus' is unavailable to plaintiff in federal court, the court finds without merit the argument that plaintiff should be denied vital discovery because he did not request such relief, or because he included damages claims in an action also asking the court to direct the hospital to restore his privileges." 138 F.R.D. at 695.

Pursuant to this opinion's analytical approach for determining the applicability of state privilege law, the court concludes that it would be inappropriate to apply California's statutory peer review privilege to this case. In contrast to the United States Supreme Court's express reluctance to fashion a federal common law peer review privilege, and Congress' clear omission of this privilege from the Health Care Quality Improvement Act, California has enacted an explicit statutory privilege whose contours continue to take shape through interpretation by the state's courts. Section 1157, both in its enactment and its evolvement, stands in direct contrast to federal privilege law and cannot be applied to the instant case.[12]

Accordingly, defendant's asserted medical peer review privilege does not preclude plaintiff's requested discovery of the Hospital's records.

### C. *PRIVACY RIGHTS OF THE HOSPITAL, PATIENTS AND PHYSICIANS*

The Hospital relies on the California Constitution, Article 1, Section 1, to assert that all of plaintiff's requests are precluded by its own privacy rights and those of its patients and physicians. Plaintiff does not dispute the existence of these rights but contends that they can be guarded by a protective order.

■■■■ The parties' privacy expectations under the California Constitution are broader than those under the United States Constitution, although the parameters of both are still being determined. They are not, however, in significant conflict. With the possible exception of the standards of interpretation (compelling interest v. balancing) discussed *infra*, the state constitutional privacy rights are readily harmonized with the federal constitution, are reasonable in scope and practical in application, and should, therefore, be recognized. This is particularly so when, as here, state privilege law creates expectations of a state's citizenry to entitlement of fundamental right that is compatible with federal law.[13]

---

**12.** *Cf., Cohn v. Wilkes General Hospital*, 127 F.R.D. 117, 121 (W.D.N.C.1989), *aff'd R. Ernest Cohn, D.C., D.A.B.C.O. v. Bond*, 953 F.2d 154 (4th Cir.1991), which applied a state statutory peer review privilege to a pendent state claim, 127 F.R.D. at 120, stating that the validity of the privilege was bolstered by "the very existence of the Act [HCQIA] and the Congressional findings incorporated into the body of the law itself", *id.*, at 121.

**13.** While this court applies state constitutional protections to the case at bar, it notes that "the

*procedure* for responding to discovery requests in federal litigation, including the procedure for the proper assertion of a privilege, is governed by federal law." *Eureka Financial Corp. v. Hartford Acc. & Indem. Co.*, 136 F.R.D. 179, 182, n. 5 (E.D.Cal.1991). The court does not therefore reverse the burdens in this case to conform to California law as set forth in *Davis v. Superior Court (Williams)*, 7 Cal.App.4th 1008, 9 Cal. Rptr.2d 331 (1992), relied upon by defendant. In *Davis*, "[t]he burden is on the party seeking the constitutionally protected information to es-

As a preliminary matter, the court notes that the Hospital has standing to assert the privacy rights of its patients and physicians. As this court stated in *Cook v. Yellow Freight System, Inc.*, 132 F.R.D. 548 (E.D.Cal.1990), "a custodian of private information 'has the right, in fact the duty, to resist attempts at unauthorized disclosure and the person who is the subject of the record is entitled to expect that his right will be thus asserted.' Indeed, the court is of the view that an uncontested and unwarranted disclosure of such information may expose the party who releases such information without a court order to potential liability." *Id.*, 132 F.R.D. at 551, n. 2, quoting *Craig v. Municipal Court*, 100 Cal.App.3d 69, 77, 161 Cal.Rptr. 19, 23 (1979).

Physicians, as custodians of their patients' medical records, also have the duty to assert the privacy rights of their patients. *Binder v. Superior Court (Neufeld)*, 196 Cal.App.3d 893, 899, 242 Cal. Rptr. 231, 234 (1987). "Where the constitutionally protected privacy interests of absent patients are coincident with the interests of the doctor, the doctor must be permitted to speak for them." *Wood v. Superior Court (Bd. of Medical Qual.)*, 166 Cal.App.3d 1138, 1145, 212 Cal.Rptr. 811, 817–818 (1985).

Moreover, the physicians' own privacy interests in their employment and disciplinary records must also be recognized and protected. *See, e.g., Harding Lawson Assoc. v. Superior Court*, 10 Cal.App.4th 7, 9–10, 12 Cal.Rptr.2d 538, 539–540 (1992). The Hospital, as custodian of these records, has standing to assert these rights. "[T]he custodian of such private information may not waive the privacy rights of persons who are constitutionally guaranteed their protection." *Board of Trustees, Etc. v.*

*Superior Court*, 119 Cal.App.3d 516, 526, 174 Cal.Rptr. 160, 164–165 (1981).

1. *Federal and State Constitutional Rights to Privacy*

The federal Constitution "does not explicitly mention any right of privacy. In a line of decisions, however ... the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *See Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). "[S]pecific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. [Citation.] Various guarantees create zones of privacy ..." *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). "[P]rotection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his life, left largely to the law of the individual states." *Katz v. United States*, 389 U.S. 347, 350–351, 88 S.Ct. 507, 510–511, 19 L.Ed.2d 576 (1967) (original emphasis).

The Supreme Court has recognized only a limited privacy interest in the confidentiality of one's medical records. In *Whalen v. Roe, supra*, 429 U.S. at 599–600, 97 S.Ct. at 876–877, the Court recognized two interrelated privacy interests subject to constitutional protection: privacy interests in avoiding disclosure of personal matters, and in independence in making certain decisions.[14] The Court stated that some disclosure of patient records is, however, a fact in today's medical system: "[D]isclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of medical practice even when the disclosure may reflect unfavorably on the character of the patient."

---

tablish direct relevance." 7 Cal.App.4th at 1017, 9 Cal.Rptr. at 337. However, as earlier noted, in federal courts once relevance is established, "[t]he party asserting an evidentiary privilege has the burden to demonstrate that the privilege applies." *Tornay v. United States, supra*, 840 F.2d at 1426.

**14.** The *Whalen* Court held that a New York statute requiring patient identification and notification to the State Department of Health for "Schedule II" prescriptions did not pose a sufficiently grievous threat to either privacy interest to establish a constitutional violation. 429 U.S. at 600, 97 S.Ct. at 877.

*Id.* at 602, 97 S.Ct. at 878. The Ninth Circuit has also acknowledged this view, stating that "[p]atient charts have public aspects not protected by the right to privacy." *See, e.g., In re Grand Jury Proceedings (Doe), supra,* 801 F.2d at 1169.

California, on the other hand, has adopted an explicit constitutional right to privacy, and recognized application of this right to patient medical records. Article 1, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." The California Supreme Court has interpreted this state constitutional right to be inalienable, *White v. Davis,* 13 Cal.3d 757, 773, 120 Cal.Rptr. 94, 105, 533 P.2d 222, 233 (1975), and broader than the federal privacy right, *Committee to Defend Reproductive Rights v. Myers,* 29 Cal.3d 252, 263, 172 Cal.Rptr. 866, 871, 625 P.2d 779, 784 (1981). The right protects against invasions of privacy by private citizens as well as by the state. *Chico Feminist Women's Health Center v. Scully,* 208 Cal. App.3d 230, 242, 256 Cal.Rptr. 194, 200 (1989), *Wilkinson v. Times Mirror Corp.* 215 Cal.App.3d 1034, 1040–1044, 264 Cal. Rptr. 194, 198–200 (1989).

Moreover, "[t]he zone of privacy created by this provision extends to the details of a patient's medical history." *Heda v. Superior Court (Davis),* 225 Cal.App.3d 525, 527, 275 Cal.Rptr. 136, 137 (1990), and cases cited therein. "A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected ... [and there is a] reasonable expectation that such personal matters will remain with the physician." *Division of Medical Quality v. Gherardini, supra,* 93 Cal.App.3d at 678–679, 156 Cal.Rptr. at 60–61 (citations omitted). On the other hand, "[t]he information that may be recorded in a doctor's files is broadranging. The chronology of ailments and treatment is potentially sensitive. Patients may disclose highly personal details of lifestyle and information concerning sources of stress and anxiety. These are matters of great sensitivity going to the core of the concerns for the privacy of information about an individual. The intrusion upon personal privacy when a state agency examines such records is substantial." *Wood v. Superior Court (Bd. of Medical Qual.), supra,* 166 Cal.App.3d at 1147, 212 Cal. Rptr. at 819.

"[F]undamental to the privacy of medical information 'is the ability to control [its] circulation[ ]' ". *Division of Medical Quality v. Gherardini, supra,* 93 Cal. App.3d at 678, 156 Cal.Rptr. at 60. The state constitutional right is directed, in part, to "the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party." *White v. Davis, supra,* 13 Cal.3d at 775, 120 Cal.Rptr. at 106, 533 P.2d at 234. Production of "individually identifiable medical records" requires protection of each patient's right of privacy. *Cf. Board of Medical Quality, Etc. v. Hazel Hawkins Memorial Hospital,* 135 Cal. App.3d 561, 566, 185 Cal.Rptr. 405, 408 (1982) (administrative investigative subpoena).[15]

---

**15.** "The physician-patient privilege and the right of privacy are closely related protections against public disclosure of private information. The patient-physician privilege 'creates a zone of privacy' (*Division of Medical Quality v. Gherardini, supra,* 156 Cal.Rptr. at 61) and therefore, the privacy interests of the patients ... [are] invoked by implication in [the physician's] assertion of the patient-physician privilege." *Binder v. Superior Court (Neufeld),* 196 Cal.App.3d 893, 899–900, 242 Cal.Rptr. 231, 234 (1987). As earlier noted, the protections accorded by this constitutional "zone of privacy" are broader than those accorded by the state patient-physician privilege. *See* note 4, *infra. See also, Heda v. Superior Court, supra,* 225 Cal.App.3d at 528, n. 1, 275 Cal.Rptr. at 138, n. 1.

As one of California Court of Appeal recently stated: "The constitutional privilege has been held to operate even though a statutory privilege does not protect the matter in question. (*Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656, 125 Cal.Rptr. 553, 542 P.2d 977; see 2 Hogan, Modern Cal. Discovery (4th ed. 1988) Privilege, § 12.28, pp. 182–183.) One court has treated it as independent of a related

California's constitutional right to privacy is considered fundamental. *White v. Davis, supra,* 13 Cal.3d at 775, 120 Cal. Rptr. at 106, 533 P.2d at 234. Early cases strictly required that any encroachment on this right be justified by a compelling state interest. *Ibid., see also, e.g., Loder v. Municipal Court for San Diego Jud. Dist.,* 17 Cal.3d 859, 864, 132 Cal.Rptr. 464, 468, 553 P.2d 624, 628 (1976), cert. den., 429 U.S. 1109, 97 S.Ct. 1143, 51 L.Ed.2d 562 (1977), *Britt v. Superior Court of San Diego County,* 20 Cal.3d 844, 855, 143 Cal.Rptr. 695, 702, 574 P.2d 766, 773 (1978). *Board of Trustees, Etc. v. Superior Court, supra,* 119 Cal.App.3d at 525–526, 174 Cal. Rptr. at 164–165. However, later cases have backed away from this approach, and applied a reasonableness test, *Wilkinson v. Times Mirror Corp., supra,* 215 Cal. App.3d at 1047, 264 Cal.Rptr. at 203, or undertaken a balancing analysis of competing interests, *see e.g., Semore v. Pool,* 217 Cal.App.3d 1087, 1097, 266 Cal.Rptr. 280, 285–286 (1990), rev. den. (May 31, 1990), *New York Times Co. v. Superior Court,* 218 Cal.App.3d 1579, 1584–1586, 268 Cal. Rptr. 21, 24–26 (1990), *Scharf v. Regents of University of California,* 234 Cal.App.3d 1393, 1408, 286 Cal.Rptr. 227, 237 (1991), rev. den. (Jan. 8, 1992). Whether the California constitutional right to privacy requires a compelling interest to be outweighed or whether a reasonableness or balancing test should be employed is a matter of express judicial controversy. *See e.g., Luck v. Southern Pacific Transp. Co.,* 218 Cal.App.3d 1, 20, 267 Cal.Rptr. 618, 629 (1990), rev. den. (May 31, 1990), cert. den., 498 U.S. 939, 111 S.Ct. 344, 112 L.Ed.2d 309 (1990) (specifically rejecting a reasonableness or balancing test). *See also, Hill v. NCAA,* 7 Cal.App.4th 1738, 1752, n. 7, 273 Cal.Rptr. 402, 410, n. 7 (1990), review granted —— Cal.3d ——, 276 Cal.Rptr. 319, 801 P.2d 1070 (1990).

### 2. *Balancing of Interests*

It is the view of this court that the compelling interest analysis, as applied to complex privacy issues, is overly restricting. The contexts in which privacy concerns manifest themselves are too broad to declare them all subject to absolute protection unless a "compelling" state or private interest warrants their disclosure. For example, third party disclosure of employment locations for a group of persons, or the third party disclosure of mailing addresses to bulk mail businesses hardly implicates the same degree of privacy interests as disclosure of employees' personnel, financial and disciplinary records. The rigidity of strict scrutiny precludes the in depth analysis that is warranted in the privacy context. An appropriate analysis requires a conscious balancing of the many interests at stake. "Privilege doctrine should be *tailored* to accommodate the specific kinds of competing interests that are in issue in the situations in which the privilege is invoked." *Kelly v. City of San Jose, supra,* 114 F.R.D. at 659. Accordingly, to the extent that the California constitutional right to privacy is absolute in its reliance on a compelling interest analysis, it is inconsistent with federal law. This court will apply those California cases which employ a balancing approach.

■ The court considers the following factors in determining the scope of protection to be accorded in the privacy context: (1) the probable encroachment of the individual's privacy right if the contested action is allowed to proceed, and the magnitude of that encroachment; (2) whether the encroachment of the privacy right would impact an area that has traditionally been off limits for most regulation; (3) whether the desired information is available from other sources with less encroachment of the privacy right; (4) the extent to which the exercise of the individual's privacy

---

statutory privilege. (*Heda v. Superior Court, supra,* 225 Cal.App.3d 525, 528, fn. 1, 275 Cal. Rptr. 136, in which the court expressly bypassed an opportunity to apply and construe the narrower statutory physician-patient privilege and an exception thereto, and instead determined the constitutional issue.) The constitutional

provision is self-executing and needs no legislation to create a legal and enforceable right of privacy for every California. (*Cutter v. Brownbridge* [1986] 183 Cal.App.3d [836] at p. 842, 228 Cal.Rptr. 545.)" *Davis v. Superior Court (Williams), supra,* 7 Cal.App.4th at 1014, 9 Cal. Rptr.2d at 334–335.

rights impinge on the rights of others; and (5) whether the interests of society at large encourage a need for the proposed encroachment.

This balancing of competing interests is underscored by the overall balancing provisions contained within Rule 26(b), Federal Rules of Civil Procedure. This Rule allows the court on its own initiative to limit discovery based, inter alia, on the needs of the case, the importance of the issues at stake, and undue burden.

■■■ Applying these factors to the instant case, the court has determined that the requested disclosure is permissible provided the identities of the patients and physicians are protected. This limitation significantly minimizes the encroachment of the affected individuals' privacy rights, thus minimizing the relative weight of the first analytical factor. While the requested disclosure clearly impacts traditional areas of privacy which have been off limits from most regulation, the protection of the patients' and physicians' identities greatly minimizes the weight of the second factor as well. The third factor weighs toward disclosure, since the requested information is not available from other sources.

The fourth and fifth factors also weigh toward disclosure. They merge here, since both bear on the policies favoring disclosure in the discovery and litigation context. The discovery and admissibility of relevant truthful information are an individual right of the litigant, as well as a significant public interest. As this court has previously noted, "litigation has the tendency to make public the sort of information that individuals would otherwise prefer to keep private. Public disclosure, in the end, is not only natural and generally unavoidable but also necessary and healthy to a process so dependent on accuracy and truth. Nonetheless, the initiation of a lawsuit does not, by itself, grant plaintiffs the right to rummage unnecessarily and unchecked through the private affairs of anyone they choose. A balance must be struck." *Cook v. Yellow Freight System, Inc., supra,* 132 F.R.D. at 551. The California courts have also recognized that the right to privacy may be outweighed by the legitimate interests of another party to a lawsuit. *Heda, supra,* 225 Cal.App.3d at 527, 275 Cal.Rptr. at 137. "Even though the inalienable right of privacy guaranteed by the California Constitution is a fundamental interest of our society, other state interests such as facilitating the ascertainment of truth pertaining to legal proceedings compete with this right." *Binder v. Superior Court (Neufeld), supra,* 196 Cal.App.3d at 900, 242 Cal.Rptr. at 234, citing *Board of Trustees, supra,* 119 Cal.App.3d at 524–525, 174 Cal.Rptr. at 163–164.

The court therefore holds that plaintiff is entitled to the requested discovery, subject to safeguarding the identities of the patients and physicians therein concerned.

## IV. DISCOVERY PERMITTED SUBJECT TO PROTECTIVE ORDER

The parties are directed to submit for this court's approval a stipulated protective order providing for disclosure of the requested discovery but insuring the privacy of patients whose records are to be disclosed, as well as protecting the identity of implicated physicians. The court suggests the use of code numbers or a comparable system which will ensure privacy but demonstrate any salient patterns of complaints or legal actions. The court may, at a later time and for good cause shown, entertain a motion for disclosing the identity of physicians with a high incidence of patient or peer complaints, insofar as this is relevant to plaintiff's claims.

The information disclosed pursuant to this order shall be designated as "Confidential Material," and shall be used solely in connection with this litigation, or related appellate procedures, and not for any other purpose. The Confidential Material shall be disclosed only to counsel for the parties and their staff, and shall not be disclosed to plaintiff without order of this court. The Hospital is directed to prepare a document-specific privilege log for any undisclosed material, if applicable, based on the attorney-client or attorney work product

privileges.[16] Material pertaining to prior legal actions are discoverable to the same extent as other documents notwithstanding that some of the material may be a matter of public record.

## CONCLUSION

Plaintiff's motion to compel production of documents and further answers to interrogatories is granted in its entirety, but disclosure is to take place as discussed above. The parties' protective order shall be submitted to the court within two weeks of the filed date of this order. Production of documents shall take place one week after the filing of the protective order.

IT IS SO ORDERED.

---

16. Any ruling on attorney-client privilege or work product immunity is premature without a specific designation of documents that are privileged and a dispute raised as to specific documents.